IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
May 12, 2003 Session

## FRED D. SLAUGHTER, and wife, JUDY SLAUGHTER v. LAURA LEIGH SLAUGHTER and DANIEL BRUCE CROWE

**Direct Appeal from the Chancery Court for Washington County**
**No. 33925     Hon. G. Richard Johnson, Chancellor**

**FILED SEPTEMBER 18, 2003**

**No. E2002-02477-COA-R3-CV**

The Trial Court gave Judgments for plaintiffs against defendants and cross-defendant Slaughter was given Judgments for compensatory and punitive damages against co-defendant Crowe and her deed to Crowe was voided.  On appeal, we affirm all Judgments except for the Judgment for punitive damages which is remanded for trial on damages.

**Tenn. R. App. P.3 Appeal as of Right; Judgment of the Chancery Court Affirmed in part, vacated in part, and Remanded.**

HERSCHEL PICKENS FRANKS, J. delivered the opinion of the court, in which CHARLES D. SUSANO, JR., J., and D. MICHAEL SWINEY, J., joined.

Keith D. Stewart, Knoxville, Tennessee, for Appellant, Daniel Bruce Crowe.

Don Arnold, Johnson City, Tennessee, for Appellees, Fred Slaughter and wife, Judy Slaughter.

Todd Covert, Knoxville, Tennessee, for Appellee, Laura Leigh Slaughter.

**OPINION**

In this action plaintiffs were awarded judgments against defendant, Laura L. Slaughter, and Laura L. Slaughter was awarded a judgment for compensatory damages against co-defendant, Daniel Bruce Crowe, as well as punitive damages, and the Court voided a warranty deed from Laura L. Slaughter to Daniel Bruce Crowe.

Daniel Bruce Crowe has appealed and raised these issues:

1.      Whether the Trial Court erred in its determination of the respective credibility of the witnesses in awarding damages, as a result of such determination?

2.      Whether the Trial Court erred in setting aside the conveyance between defendant Crowe and defendant Slaughter?

3.      Whether the Trial Court erred in awarding punitive damages against the weight of the evidence?

Since the credibility of witnesses is the determinative issue on appeal, we quote extensively as pertinent from the Chancellor's Memorandum Opinion and Final Order:

This painfully interesting and somewhat complex case results from a lengthy factual history involving indulgent parents, their spoiled and sick daughter and her bogus ex-boyfriend.

The Plaintiffs (the parents, Dr. And Mrs. Slaughter) sue their daughter, Defendant Slaughter, and her ex-boyfriend, Defendant Crowe, for a debt of $259,000.00, plus accrued interest since March 31, 1999. They also ask the Court to declare that the conveyance of realty from Slaughter to Crowe was a fraud and, therefore, should be declared void. In addition, they ask the Court to sell the realty to satisfy the debt. . . .

Slaughter and Crowe deny the substantive allegations of the complaint and assert various affirmative defenses.

Next, Slaughter cross-sues her Co-defendant for: fraud, fraud in the inducement, deceit, fraudulent and negligent misrepresentation, conversion, civil conspiracy, conspiracy to defraud, intentional infliction of emotional distress as a result of conduct characterized by outrageousness, recklessness, and maliciousness, she also sues Crowe for punitive damages, and for the title to the realty to be restored to her by Crowe.

Crowe denies the substantive allegations of the cross-complaint and asserts the Statute of Frauds, comparative fault, and various other defenses.

. . .

At the conclusion of the presentation of evidence, the Court granted the Plaintiffs' motion, without objection, to conform the pleadings to the proof.

Findings of Fact and Conclusions of Law

Dr. And Mrs. Slaughter's (hereinafter Plaintiffs) daughter, Laura Leigh Slaughter (hereinafter Slaughter) is a troubled young lady. Although she is a highschool graduate and, after several tries, a college graduate, she suffers multiple medical maladies including depression and anxiety, which are believed to result from a sexual assault she experienced when she was six to seven years old. She still suffers from depression and anxiety and takes medication for these disorders. . . .

While in college, in the mid-1990s, Slaughter met the Defendant, Daniel Bruce Crowe (hereinafter Crowe). They dated for almost a year, during which time Crowe became aware of Slaughter's various medical conditions. Crowe's knowledge of Slaughter's condition included driving her to her psychiatrist's office for appointments and, on one occasion, reporting to Mrs. Slaughter his fear that the Defendant Slaughter might commit suicide. Slaughter and Crowe remained friends and stayed in contact with one another from time to time after they stopped dating.

In January of 1998, Slaughter became employed as a pharmaceutical representative making $37,500.00 a year, plus bonus. In early 1999, Slaughter became interested in buying a home in Johnson City. Slaughter enlisted the help of her mother in getting her father to help her purchase the house. . . . Dr. Slaughter was reluctant and wanted to think about it. Finally, Dr. Slaughter capitulated and agreed to loan Slaughter $259,000.00 as a bridge loan until her mortgage loan application was approved. As a result, Dr. Slaughter borrowed $259,000.00 at nine percent (9%) per annum on his personal line of credit at his bank and instructed the bank to issue Slaughter a check in that sum. Slaughter purchased the home on March 5, 1999. . . Subsequently, because of disagreements with her father, Slaughter refused to sign a promissory note for the loaned sum and refused to sign a deed of trust to the Plaintiffs on the subject realty to secure payment of the loan. . . .

In the meantime, Slaughter stole three (3) checks from her father's office account, wrote the checks to herself, and forged her father's signature; one on February 23, 1999 for the sum of $3,000.00, and two checks on April 1, 1999, one for $8,000.00 and the other for $52,000.00. Dr. Slaughter was unaware fo the theft at the time of the "bridge loan" to Slaughter. He became aware of the stolen and forged checks at a later date when he had his account audited. Slaughter unlawfully took $63,000.00 from her father and converted it to her use. Slaughter quit her job as a pharmaceutical sales representative in July of 1999. . . .

Although still maintaining her home in Johnson City, Slaughter went to work for Crowe's company, Skynet, in Knoxville sometime around the Spring of 2000. Crowe's Knoxville company sells security systems for residential and commercial use. The work that Slaughter did for the company is disputed. Crowe visited

Slaughter at her Johnson City home. Slaughter asked Crowe about repairs to her house because Crowe had told Slaughter that he had a contractor's license. . . . Slaughter also knew that Crowe worked with his father buying/selling real estate and renting houses in Knoxville and Kingston, Tennessee. Based on pretense, Crowe got Slaughter's deed to the house, . . . and had a deed drafted deeding Slaughter's house to himself. In spite of the affidavit of market value recited on the deed, reflecting the house's worth as $259,000.00, Crowe admits he paid Slaughter a $10,000.00 check for the house. Slaughter insists the $10,000.00 check was for work at Skynet and "moving expenses", as Crowe convinced Slaughter to move from her house so he could "refinish" the floors. Slaughter made inquiry to Crowe as the check reflected in was for the "purchase of Berkshire", the name of the street on which the house is located. Crowe replied, "Yeah, like I could purchase your home for $10,000.00". If the $10,000.00 was for purchase of the house, it was grossly inadequate consideration for a house valued at $259,000.00. Crowe and his partner also convinced Slaughter that placing Crowe's name on the deed would make him a "mutual owner" and this would protect Slaughter's rights against her parents, as Crowe was fully aware that Slaughter had never paid the loan to her parents for the purchase of the house. Slaughter did not ask Crowe to purchase her home. Slaughter did not intent to deed her interest in the home to Crowe. Slaughter believed Crowe. Crowe was very convincing. Slaughter's gullibility and business naivety were some of the tools that Crowe and his partner used to get Slaughter to execute the document deeding Slaughter's $259,000.00 Johnson City home to Crowe. Crowe drafted the document deeding Slaughter's home to himself . . . The alleged agreement for Crowe to purchase Slaughter's $259,000.00 house is rescinded for lack of adequate consideration; the agreement was induced by fraudulent and deceitful conduct on the part of Crowe; and Crowe made material and intentional misrepresentations to Slaughter which she relied on as inducement for Slaughter to sign the deed. . . . Crowe's title to Slaughter's realty is the result of fraud, deceit, and material intentional misrepresentations perpetrated by Crowe on Slaughter. Crowe got his title to the realty from a young woman of marginal mental health, as Slaughter suffered from significant emotional frailties that cause her commercial vulnerability. Crowe was strongly superior mentally, emotionally, and business savvy-wise compared to Slaughter, all of which Crowe took to his full and complete advantage. . . .

Crowe continued his nefarious conduct toward Slaughter.

Crowe insisted that Slaughter immediately cash the $10,000.00 check that Crowe says was for the purchase of the house and Slaughter says she earned as salary and moving expenses from Johnson City to Knoxville. Crowe went with Slaughter to a Johnson City bank to cash the check. Slaughter got $10,000.00 cash in a bank envelope which she then placed in the glove box of her BMW vehicle. Crowe and Slaughter returned to Slaughter's home where they were joined by Crowe's partner.

-4-

The next morning, Slaughter found that someone had taken the $10,000.00 cash from the locked glove box of her BMW while the vehicle was parked in her locked garage at her home on Berkshire. Somehow, some way, someone had access to Slaughter's house and to her vehicle and knew that the $10,000.00 cash was in the glove box. Nothing else was disturbed about her car. Everything else in the car was as it was left by Slaughter, except the $10,000.00 cash in the envelope in the locked glove box in the car, in the closed and locked garage. They keys to Slaughter's vehicle had been stolen about two (2) months prior to the theft. Crowe had previously obtained a key to Slaughter's home, ostensibly so he could perform the repairs and refinish the floors in the home. Slaughter reported the theft to the police. Crowe, or Crowe's agent, stole the $10,000.00 cash from Slaughter's vehicle and converted the same to his/their use. Slaughter did not prove, to the satisfaction of the Court, that the $10,000.00 was for her "salary" or an "advance" or for "moving expenses".

The next day, Slaughter loaded her BMW with her clothes, jewelry, and other personalty, and drove to Knoxville to work for Crowe's business while living in an apartment over the business. The following day, Slaughter discovered her BMW was missing. She reported the theft to the Knoxville police who advised Slaughter that her vehicle was registered in the name of Crowe. Crowe insisted he paid Slaughter $5,000.00 cash for the BMW, which Slaughter denies. Someone forged Slaughter's name to the title of her BMW. A couple of months later, Crowe sold the BMW to his partner's father for $12,000.00 on the date of this sale, the vehicle had a fair market value of $25,000.00. Crowe forged Slaughter's name to the title of her vehicle. Crowe paid Slaughter nothing for Slaughter's vehicle. Crowe obtained Slaughter's BMW by fraud, deceit, and conversion. Crowe owes Slaughter the fair market value of her automobile, i.e., $25,000.00.

Crowe continued to denude Slaughter's estate.

Slaughter's accommodations at the upstairs "Skynet" apartment consisted of her sleeping on the floor. What Slaughter lacked in accommodations, however, she made up for by having one room full of "high dollar" clothes and jewelry which she had transported from her Johnson City home. In order to have appropriate sleeping accommodations, Slaughter moved in with a woman she met in a Knoxville grocery stores. Slaughter "locked" her clothes and jewelry in a room at Skynet. When she attempted to retrieve her clothes and jewelry, she found that Crowe's partner had changed the lock to the room where the clothes and jewelry were located. Slaughter was told that her clothes had been placed in an alley behind Skynet. She found several garbage bags of clothes, but the majority of her clothing and jewelry were missing. An employee of Skynet, witness Vanover, saw Crowe and his mother one morning at 4:00 A.M., in the alley behind Skynet, going through Slaughter's "garbage bag" belongings and taking what they wanted which not only included "high-dollar" clothes and jewelry, but two mink coats (Slaughter's grand-father was

a furrier and had given the items to her), all of which Slaughter valued at $80,000.00. This same employee, whom Slaughter had dated, also testified that Crowe and his partner were crooks, whose business practices included implementing, teaching, and practicing some of the finer points of forgery, cheating employees out of their justly earned pay, intimidating employees ("We have a bullet for you."), how to talk to the police when they have you involved in an investigation, and how to act in court. Amazingly, Crowe's demeanor on the witness stand mirrored the way in which Crowe and his partner had instructed witness Vanover to act while testifying in court. Crowe and/or his agent(s) obtained Slaughter's clothing and jewelry by conversion and theft. . . .

While Slaughter was living in Knoxville, Crowe stripped Slaughter's home of its fixtures, as well as its furnishings. Slaughter's hot tub and lawn furniture were located at Crowe's house. Crowe sold a storage bin of Slaughter's personalty to his partner's father for $3,800.00. The fair market value of the personalty and fixtures that was owned by Slaughter and taken by Crowe without Slaughter's consent was $120,000.00. Crowe produced a document drafted by Crowe and signed by Slaughter that transferred all of Slaughter's personalty in the house to Crowe. Slaughter said she signed the document because Crowe explained that her signature was required in order for him to obtain insurance, since he was working on the house. Exhibit 14 is a sham and is void. Crowe never obtained lawful ownership of Slaughter's household goods, furnishings, and fixtures. Crowe gained control of Slaughter's household goods, furnishings, and fixtures by conversion, fraud, deceit, and intentional misrepresentations.

In the meantime, about June of 2002, one of Slaughter's boyfriends (not Crowe or Vanover) directed her to a finance company in Johnson City in order for her to obtain funds to pay off her debts, including the money owed her father. Slaughter says this boyfriend agreed to make the monthly payment on this debt for "work she would do for him." As a result, the finance company took a first deed of trust from Slaughter on her Johnson City home, securing a $50,000.00 loan. After Slaughter refused to sign a note and deed of trust to her father as security for the $259,000.00 he loaned her for the purchase of the realty, Dr. Slaughter had a title examination done on the realty. The title examination revealed the finance company's first lien deed of trust. Dr. Slaughter then purchased Slaughter's note and deed of trust from the finance company in November of 2000 for $55,451.09. At the time of Dr. Slaughter's purchase of the note and deed of trust, the finance company was ready to initiate foreclosure, as Defendant Slaughter's boyfriend was delinquent in repaying the loan.

The Court has carefully considered the various elements of credibility in evaluating witnesses' testimony. The motive, the interest, and other applicable elements of evaluating the witnesses' testimony, as well as the exhibits, have been

utilized, including the demeanor of the witnesses. The Court was taken aback when Crowe's demeanor mimicked that which witness Vanover testified was the demeanor that Crowe and his partner had told him to utilize. Crowe's credibility, in light of the record, is poor. All of the other witnesses had good credibility. Defendant Slaughter's demeanor and her testimony demonstrated a wide range of emotions, from crying, giving rambling answers that did not always answer the question, inappropriately laughing, and giddy some of the time but, nevertheless, genuine. It was evident to the Court that Defendant Slaughter did not understand at the time, that Crowe was robbing her of her estate. This Court fails to understand her attraction to her tormentor. Her trust in Crowe was misplaced. Defendant's Slaughter's ignorance of the documents she was signing for Crowe was appalling but, nevertheless, she had a true lack of understanding of the documents.

Defendant Crow argues that the Trial Court "erred in its determination of the respective credibility of the witnesses."

As the Supreme Court has observed:

> Unlike appellate courts, trial courts are able to observe witnesses as they testify and to assess their demeanor, which best situates trial judges to evaluate witness credibility. *See State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990); *Bowman v. Bowman*, 836 S.W.2d 563, 566 (Tenn. Ct. App. 1991). Thus, trial courts are in the most favorable position to resolve factual disputes hinging on credibility determinations. *See Tenn-Tex Properties v. Bornell-Electro, Inc.*, 778 S.W.2d 423, 425-26 (Tenn. 1980); *Mitchell v. Archibald*, 971 S.W.2d 25, 29 (Tenn. Ct. App. 1998). Accordingly, appellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary. *See Humphrey v. David Witherspoon, Inc.*, 734 S.W.2d 315-16 (Tenn. 1987); *Bingham v. Dyeersbury Fabrics Co., Inc.,* 567 S.W.2d 169, 170 (Tenn. 1978).

*Wells v. Tennessee Bd. Of Regents*, 9 S.W.3d 779 at 783 (Tenn. 1999).

There is no basis to assail the Judge's assessment of Crowe's credibility. As to Laura Slaughter, there are significant inconsistencies in her testimony, and defendant Crowe points to the fact that she executed the documents, but her testimony is contrary to what the documents actually state. In most of the cases in this area of the law dealing with voiding deeds, the deeds as to form are valid. Clearly, the Trial Judge reconciled the inconsistencies in Laura Slaughter's testimony on his finding that she "suffers from depression and anxiety and takes medication for these disorders." Consistent with this condition, he noted her emotional outbursts on the witness stand were consistent with her emotional state.

The Trial Judge observed the witnesses and evaluated their testimony. We find no basis to reverse his ruling on the respective credibility of the witnesses.

Next, Crowe argues the Court erred in setting aside the deed between defendant Crowe and defendant Slaughter. The time-honored rule in equity in cases to set aside fraudulent conveyances states where fraud will be presumed:

"Where the consideration is shockingly inadequate. Where the consideration paid, or promised, is so grossly inadequate as to shock the conscience, especially when accompanied by other inequitable circumstances, such as concealments, misrepresentations, undue advantage or oppression on the part of the person obtaining the benefit, or ignorance, weakness of mind, sickness, old age, incapacity or pecuniary necessity on the part of the other party, in such cases, fraud is presumed.

*Gibsons Suits in Chancery*, § 196, 6th Ed., p.192-3, Inman. *Also see,* § 448.

This Court has stated the Rule that a deed executed at a time when the grantor is mentally unbalanced, has no intelligent comprehension of the acts being performed, and is incapable of transacting such business is void. *Henson v. Robinson*, 364 S.W.2d 9751 (Tenn. App. 1962). Moreover, a party need not to have been declared mentally incompetent to render a deed voidable. Mental debility not necessarily amounting to incompetency is a basis for cancellation of a deed. *Bedwell v. Bedwell,* 774 S.W.2d 953 (Tenn. App. 1989). The evidence does not preponderate against the Chancellor's finding on this issue. Tenn. R. App. P. 13(d).

Finally, defendant argues the Court erred in awarding punitive damages against the weight of the evidence.

The Chancellor's finding of fact on this issue established a basis to award punitive damages, and the evidence does not preponderate against this finding. Tenn. R. App. P. 23(d). However, the Trial Court should have conducted an evidentiary hearing on the amount of punitive damages, and we vacate his Judgment of punitive damages against defendant Crowe, and remand for a new trial on punitive damages only. At that time the Court will follow the instructions in *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896 (Tenn. 1992) and take into account the factors set forth in *McLaron v. McLaron*, 2001 WL 91, 2707 (Tenn. Ct. App. August 13, 2001).

The award of compensatory damages on behalf of the plaintiffs and cross-plaintiff are affirmed. The Judgment for punitive damages is vacated and the cause is remanded for a new trial on the sole issue of the amount of punitive damages.

The costs of the appeal are assessed to defendant Daniel Bruce Crowe.

_____
HERSCHEL PICKENS FRANKS, J.

-8-